## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CAPKA,<br><br>              Plaintiff,<br><br>     v.<br><br>QIAGEN N.V., ROLAND SACKERS, HÅKAN BJÖRKLUND, ELIZABETH E. TALLETT, METIN COLPAN, STÉPHANE BANCEL, LAWRENCE A. ROSEN, ELAINE R. MARDIS, and ROSS L. LEVINE,<br><br>              Defendants. | Case No.:<br><br>JURY TRIAL DEMANDED<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### BACKGROUND

1.      This action concerns a proposed transaction announced on March 3, 2020, pursuant to which QIAGEN N.V. ("QGEN" or "the Company") will be acquired by Thermo Fisher Scientific Inc. ("TFS").

2.      On March 3, 2020, QGEN's Supervisory Board of Directors and Managing Board of Directors (the "Boards" or "Individual Defendants") caused the Company to enter into a business combination agreement (the "Merger Agreement"), pursuant to which Quebec B.V., a wholly-owned subsidiary of TFS, commenced a tender offer to purchase all of QGEN's outstanding common stock for €39.00 or $42.62 per share in cash  (the "Tender Offer").

3.      On May 18, 2020 in order to convince QGEN's stockholders to tender their shares, defendants authorized the filing of a materially incomplete and misleading Schedule 14D-

9 Solicitation/Recommendation Statement (the "Solicitation Statement") with the United States

Securities and Exchange Commission ("SEC").

4.      The Solicitation Statement omits material information with respect to the Tender

Offer, which renders the Solicitation Statement false and misleading.    Accordingly, Plaintiff

alleges herein that defendants violated Sections 14(d), 14(e), and 20(a) of the Securities Exchange

Act of 1934 (the "1934 Act") in connection with the Solicitation Statement.

5.      In addition, the Tender Offer is scheduled to expire at 6:00 p.m., Eastern Time,

on July 27, 2020 (the "Expiration Time").  It is imperative that the material information that has

been omitted from the Solicitation Statement is disclosed to the Company's stockholders prior to

the Expiration Time so they can properly determine whether to tender their shares.

## JURISDICTION & VENUE

6.      This Court has jurisdiction over the claims asserted herein pursuant to Section

27 of the 1934 Act and 28 U.S.C. §1331 because the claims asserted herein arise under Sections

14(d), 14(e) and 20(a) of the 1934 Act and Rule 14d-9.

7.      This Court has jurisdiction over defendants because each defendant is either a

corporation that conducts business in this District, or is an individual with sufficient minimum

contacts with this District so as to make the exercise of jurisdiction by this Court permissible

under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C.

§ 78aa, as well as under 28 U.S.C. § 1391, because, among other things: (a) the conduct at issue

will have an effect in this District; (b) a substantial portion of the transactions and wrongs

complained of herein, occurred in this District; and (c) certain defendants have received

substantial compensation in this District by doing business here and engaging in numerous

activities that had an effect in this District. Additionally, the Company's common stock trades on the NYSE, which is headquartered in this District.

## **THE PARTIES**

9.      Plaintiff is, and has been continuously throughout all times relevant hereto, an owner of QGEN common stock.

10.      Defendant QGEN is a Dutch entity and a party to the Merger Agreement. QGEN common stock is traded on the NYSE under the ticker symbol "QGEN."

11.      Defendant Roland Sackers is the Chief Financial Officer and director of the Managing Board of the Company.

12.      Defendant Håkan Björklund is a director and Chairman of the Supervisory Board of the Company.

13.      Defendant Elizabeth E. Tallett is a director of the Supervisory Board of the Company and Chairwoman of the Compensation Committee.

14.      Defendant Metin Colpan is a director of the Supervisory Board of the Company.

15.      Defendant Stéphane Bancel is a director of the Supervisory Board of the Company.

16.      Defendant Lawrence A. Rosen is a director of the Supervisory Board of the Company and Chairman of the Audit Committee.

17.      Defendant Elaine R. Mardis is a director of the Supervisory Board of the Company.

18.      Defendant Ross L. Levine is a director of the Supervisory Board of the Company.

## FACTS

19.     QGEN is the financial and management holding company of the QIAGEN Group.  QIAGEN Group is a leading provider of life science and molecular diagnostic solutions. The QIAGEN Group's mission is to enable customers across the continuum of molecular testing from life sciences research to clinical health to unlock valuable molecular insights faster, better and more efficiently from the raw biological sample through to the final interpreted result.  The QIAGEN Group serves its customers in two major customer classes.  Molecular Diagnostics and Life Sciences.

20.     TFS, manufactures scientific instruments, consumables, and chemicals. TFS offers analytical instruments, laboratory equipment, software, services, consumables, reagents, chemicals, and supplies to pharmaceutical and biotech companies, hospitals and clinical diagnostic labs, universities, research institutions, and government agencies.

21.     On March 3, 2020, QGEN's Boards caused the Company to enter into the Merger Agreement.

22.     Pursuant to the terms of Merger Agreement Quebec B.V., a private limited liability company organized under the laws of the Netherlands and wholly-owned subsidiary of TFS, commenced the Tender Offer to acquire all of QGEN's outstanding common stock for €39.00 or $42.62 per share in cash.

23.     According to the press release announcing the Proposed Transaction:

Thermo Fisher Scientific Inc. (NYSE: TMO), the world leader in serving science, and QIAGEN N.V. (NYSE: QGEN; Frankfurt Prime Standard: QIA), a leading global provider of molecular diagnostics and sample preparation technologies, today announced that their boards of directors, as well as the managing board of QIAGEN N.V., have unanimously approved Thermo Fisher's proposal to acquire QIAGEN for €39 per share in cash. The offer price represents a premium of approximately 23% to the closing price of QIAGEN's common stock on the Frankfurt Prime Standard on March 2, 2020, the last trading day prior to the

announcement of the transaction. Thermo Fisher will commence a tender offer to acquire all of the ordinary shares of QIAGEN.

The transaction values QIAGEN at approximately $11.5 billion at current exchange rates, which includes the assumption of approximately $1.4 billion of net debt.

24.     The Merger Consideration is unfair because, among other things, the intrinsic value of the Company is in excess of the amount the Company's stockholders will receive in connection with the Tender Offer.

25.     It is therefore imperative that the Company's common stockholders receive the material information that defendants have omitted from the Solicitation Statement so that they can meaningfully assess whether to tender their shares.

26.     Section 14 of the Merger Agreement provides for an "exclusivity" clause that prevents QGEN from soliciting alternative proposals and constraints its ability to negotiate with potential buyers:

14.1.2 During the Exclusivity Period, except as expressly permitted pursuant to clause 15:

(a) the Company shall not and shall not publicly announce an intention to, and shall ensure that none of its Subsidiaries shall, and shall make reasonable best efforts that none of their respective directors, officers, employees, agents, advisers or other Representatives, including the members of the Boards, shall or shall publicly announce an intention to, directly or indirectly, approach, initiate, enter into or continue discussions or negotiations with (other than informing Persons of the provisions contained in this clause 14), or provide any non-public information relating to the Group to, or otherwise approach, solicit or knowingly encourage any third-party with respect to a potential offer or proposal that constitutes or would reasonably be expected to lead to a potential offer for the acquisition of more than 20% of the Company Shares or assets (including for this purpose the outstanding equity securities of Subsidiaries of the Company and any entity surviving any merger or combination including any of them) of the Company or its Subsidiaries representing more than 20% of the revenues, net income or assets (in each case, on a consolidated basis) of the Company and its Subsidiaries, taken as a whole (each an "**Alternative Proposal**");

(b) the Company shall not approve or recommend, or authorize, execute or enter into any letter of intent, memorandum of understanding, agreement in principle,

merger agreement, acquisition agreement, option agreement, joint venture agreement, partnership agreement or other contract with respect to an Alternative Proposal; and

(c) the Company shall, and shall cause each of its Subsidiaries to, and shall make reasonable best efforts to cause each of its and their respective directors, officers and other Representatives to, immediately cease and cause to be terminated any and all existing discussions or negotiations with any Person conducted prior to the date of this Agreement with respect to any Alternative Proposal, and shall not modify, amend or terminate, or waive, release or assign, any provisions of any confidentiality or standstill agreement (or any similar agreement) to which the Company or any of its Subsidiaries is a party relating to any such Alternative Proposal and shall enforce the provisions of any such agreement; provided, that the Company shall, subject to and in accordance with clause 15 be permitted to release or waive any such standstill obligations prior to the End of the Acceptance Period solely to the extent necessary to permit the party referenced therein to submit an unsolicited bona fide written Alternative Proposal to the Boards on a confidential basis conditioned upon such Person agreeing that the Company shall not be prohibited from providing any information to the Buyer regarding any such Alternative Proposal in accordance with the terms of this clause 14 and clause 15. The Company shall promptly (and in any event within five (5) Business Days of the date of this Agreement) request each Person that has, prior to the date of this Agreement, executed a confidentiality agreement in connection with its consideration of any Alternative Proposal to, in accordance with the terms of such agreement, return or destroy all confidential information furnished prior to the execution of this Agreement to or for the benefit of such Person by or on behalf of the Company or any of its Subsidiaries. The Company agrees that it shall promptly inform its Representatives of the obligations undertaken in this clause 14.

27.    The Company must also promptly advise TFS of any proposals or inquiries received from other parties. Section 15.1.2 of the Merger Agreement states:

In addition to the obligations of the Company set forth in clauses 14 and 15, as promptly as practicable (and in any event within forty-eight (48) hours) after receipt of any Alternative Proposal or any request for nonpublic information or any inquiry that would reasonably be expected to lead to any Alternative Proposal, the Company shall provide the Buyer with written notice of the material terms and conditions of such Alternative Proposal, request or inquiry, and the identity of the Person(s) making any such Alternative Proposal, request or inquiry, if not previously provided. Commencing upon the provision of any notice referred to above and continuing until such Alternative Proposal, request or inquiry I withdrawn, (i) the Company (or its outside legal counsel) shall keep the Buyer (or its outside legal counsel) reasonably informed regarding the status and material terms (including changes to the material terms) of discussions and negotiations relating to any such Alternative Proposal, request or inquiry (and within forty-eight

(48) hours of any changes to the status or material terms thereof) and (ii) the Company shall, as promptly as practicable (and in any event within forty eight (48) hours following the receipt or delivery thereof), provide the Buyer (or its outside legal counsel) with unredacted copies of all written materials, proposals or proposed transaction agreements (including al schedules and exhibits thereto) relating to any such Alternative Proposal.

28.     In addition, Section 17.1.1 of the Merger Agreement requires QGEN to make a "termination payment of $367,000,000 in cash" in the event this agreement is terminated by QGEN and improperly constrains the Company from obtaining a superior offer.

29.     Defendants filed the Solicitation Statement with the SEC in connection with the Tender Offer.  As alleged herein, the Solicitation Statement omits material information, which renders the Solicitation Statement false and misleading.

30.     First, the Solicitation Statement omits material information regarding QGEN's financial projections.

31.     With respect to QGEN's financial projections, the Solicitation Statement fails to disclose all line items used to calculate EBITDA, adjusted EBITA, and unlevered free cash flow.

32.     The disclosure of projected financial information is material information necessary for QGEN stockholders to gain an understanding of the basis for any projections as to the future financial performance of the company.  In addition, this information is material and necessary for stockholders to understand the financial analyses performed by the Company's financial advisors rendered in support of any fairness opinion.

33.     Second, the Solicitation Statement omits material information regarding the analysis performed by the Company's financial advisors Barclays Bank PLC ("Barclays") and Goldman Sachs International ("Goldman") in connection with the Tender Offer.

34.     With respect to *Barclays's Selected Precedent Transaction Analysis*, the Solicitation Statement fails to disclose: (i)   the individual multiples and metrics for the

transactions observed by Barclays in the analysis, (ii) Barclays's full basis for applying an Enterprise Value/LTM EBITDA multiple range of 18.0x to 22.0x, (iii) the projected net debt, (iv) the range of illustrative enterprise values, and (v) the number of fully diluted outstanding QGEN Shares.  This information must be disclosed to make the Solicitation Statement not materially misleading to QGEN stockholders and provide stockholders with full and relevant information in considering whether to tender their shares.

35.     With respect to *Barclays's Illustrative Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose:  (i) the Company's terminal value, (ii) all line items used to calculate unlevered free cash flow, (iii) Barclays's full basis for applying the discount rates ranging from 7.5% to 8.5%, and (iv) and Barclays's full basis for applying terminal value exit rates of 16.0x to 20.0x.  This information must be disclosed to make the Solicitation Statement not materially misleading to QGEN stockholders and provide stockholders with full and relevant information in considering whether to tender their shares.

36.     With respect to *Barclays's Illustrative Present Value of Future Share Price Analysis*, the Solicitation Statement fails to disclose: (i) Barclays's full basis for applying the multiples ranging from 22.0x to 26.0x, and (ii) Barclays's full basis for applying the illustrative discount rates of 9.0% to 10.0%.  This information must be disclosed to make the Solicitation Statement not materially misleading to QGEN stockholders and provide stockholders with full and relevant information in considering whether to tender their shares.

37.     With respect to *Barclays's Illustrative Selected Comparable Company Analysis*, the Solicitation Statement fails to disclose: (i) the individual multiples and metrics for the individual companies observed by Barclays in the analysis, and (ii) the inputs and assumptions underlying the selection of a range of 16.0x to 21.0x multiples of EV/Adjusted EBITDA and a

range of 22.0x to 26.0x multiples of P/E for QIAGEN.  This information must be disclosed to make the Solicitation Statement not materially misleading to QGEN stockholders and provide stockholders with full and relevant information in considering whether to tender their shares.

38.     With respect to *Goldman's Selected Precedent Transaction Analysis*, the Solicitation Statement fails to disclose: (i)   the individual multiples and metrics for the transactions observed by Goldman in the analysis, (ii) Goldman's full basis for applying an Enterprise Value/LTM EBITDA multiple range of 18.0x to 22.0x, (iii) the projected net debt, (iv) the range of illustrative enterprise values, and (v) the number of fully diluted outstanding QGEN Shares.  This information must be disclosed to make the Solicitation Statement not materially misleading to QGEN stockholders and provide stockholders with full and relevant information in considering whether to tender their shares.

39.     With respect to *Goldman's Illustrative Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose:  (i) the Company's terminal value, (ii) all line items used to calculate unlevered free cash flow, (iii) Goldman's full basis for applying the discount rates ranging from 6.5% to 7.5%, and (iv) and Goldman's full basis for applying terminal value exit rates of 16.0x to 20.0x.  This information must be disclosed to make the Solicitation Statement not materially misleading to QGEN stockholders and provide stockholders with full and relevant information in considering whether to tender their shares.

40.     With respect to *Goldman's Illustrative Present Value of Future Share Price Analysis*, the Solicitation Statement fails to disclose: (i) Goldman's full basis for applying the multiples ranging from 22.0x to 26.0x, and (ii) Goldman's full basis for applying an illustrative discount rate of 7.4%.  This information must be disclosed to make the Solicitation Statement not materially misleading to QGEN stockholders and provide stockholders with full and relevant

information in considering whether to tender their shares.

41.     With respect to *Goldman's Premia Analysis*, the Solicitation Statement fails to disclose the transactions observed by Goldman in the analysis.   This information must be disclosed to make the Solicitation Statement not materially misleading to QGEN stockholders and provide stockholders with full and relevant information in considering whether to tender their shares.

42.     With respect to *Goldman's Illustrative Selected Comparable Company Analysis*, the Solicitation Statement fails to disclose the individual multiples and metrics for the individual companies observed by Goldman in the analysis.   This information must be disclosed to make the Solicitation Statement not materially misleading to QGEN stockholders and provide stockholders with full and relevant information in considering whether to tender their shares.

43.     Third, the Solicitation Statement fails to disclose the potential conflicts of interest faced by the Company's financial advisors Barclays and Goldman.

44.     With respect to Barclays, the Solicitation Statement sets forth:

Barclays expects, based on its own assumptions and projections as of May 14, 2020, to make a payment of approximately $3 million to QIAGEN upon termination of the Bond Hedge and Warrant Transactions 2024 and expects to realize a net gain of approximately $2.6 million on the Bond Hedge and Warrant Transactions 2024 as a result of the Proposed Transactions

45.     The Solicitation Statement fails, however, fails to disclose, upon termination of the Bond Hedge and Warrant Transactions 2024, Barclays's estimated payment to QGEN and net gain in the absence of the Tender Offer.

46.     With respect to Goldman, the Solicitation Statement sets forth:

assuming the Proposed Transactions were consummated on May 18, 2020, Goldman Sachs expects to realize a net gain of up to $20 million on the Bond Hedge and Warrant Transactions 2023 as a result of the Proposed Transactions

47.     The Solicitation Statement fails, however, fails to disclose, upon termination of the Bond Hedge and Warrant Transactions 2023, Goldman's estimated payment to QGEN and net gain in the absence of the Tender Offer.

48.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

49.     Fourth, the Solicitation Statement also provides that the Company entered into confidentiality agreements.  However, the terms of these confidentiality agreements, including whether they contain standstill and/or "don't ask, don't waive" ("DADW") provisions, are undisclosed.  Without further information regarding the terms of these agreements, and whether they contained standstill and/or DADW provisions, including whether those provisions have fallen away up or are still in effect, Company stockholders are unable to properly evaluate the ability of these parties that earlier expressed interest in acquiring the Company to offer them a better deal.  If the confidentiality agreements contained standstill provisions – and especially if they contained DADW provisions – then those counterparties have been and will be hindered or even completely precluded from making a superior proposal. The extent of such hindrances is material information of which the stockholders must be informed when considering whether to tender their shares.  The omission of this information renders the descriptions of the confidentiality agreements the Company entered into materially incomplete and misleading, as the failure to disclose the existence of standstill and/or DADW provisions creates the false impression that any of the parties who signed non-disclosure agreements could make a superior proposal.

50.     The omission of the above-referenced material information renders the

Solicitation Statement false and misleading.

51.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## CLAIMS FOR RELIEF

## COUNT I

## (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(e) OF THE EXCHANGE ACT)

52.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

53.     Section 14(e) of the 1934 Act states, in relevant part, that:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders[.]

54.     Defendants disseminated the misleading Solicitation Statement, which contained statements that, in violation of Section 14(e) of the 1934 Act, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not misleading.

55.     The Solicitation Statement was prepared, reviewed, and/or disseminated by defendants.

56.     The Solicitation Statement misrepresented and/or omitted material facts in connection with the Tender Offer as set forth above.

57.     By virtue of their positions within the Company and/or roles in the process and the preparation of the Solicitation Statement, defendants were aware of this information and their duty to disclose this information in the Solicitation Statement.

58.     The omissions in the Solicitation Statement are material in that a reasonable shareholder will consider them important in deciding whether to tender their shares in connection with the Tender Offer. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available.

59.     Defendants knowingly or with deliberate recklessness omitted the material information identified above in the Solicitation Statement, causing statements therein to be materially incomplete and misleading.

60.     By reason of the foregoing, defendants violated Section 14(e) of the 1934 Act.

61.     Because of the false and misleading statements in the Solicitation Statement, plaintiff is threatened with irreparable harm.

62.     Plaintiff has no adequate remedy at law.

## COUNT II

### (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(d) OF THE EXCHANGE ACT AND RULE 14d-9 PROMULGATED THEREUNDER)

63.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

64.     Section 14(d)(4) of the 1934 Act states:

Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

65.     Rule 14d-9(d) states, in relevant part:

Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

Item 8 requires that directors must "furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

66.     The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

67.     Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing statements therein to be materially incomplete and misleading.

68.     The omissions in the Solicitation Statement are material to plaintiff, and who will be deprived of his right to make a fully informed decision with respect to the Tender Offer if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT III

### (AQGENST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT)

69.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

70.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Solicitation filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

71.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Solicitation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Tender Offer.  The Solicitation Statement at issue contains the unanimous recommendation of the Board to approve the Tender Offer. The Individual Defendants were thus directly involved in the making of the Solicitation Statement.

73.    In addition, as the Solicitation sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Solicitation purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

74.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

75.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(e) and 14(d) and Rule 14d-9, by their acts and omissions as alleged herein. By virtue of their positions as

controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

76.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Tender Offer;

B.    In the event defendants consummate the Tender Offer, rescinding it and setting it aside or awarding rescissory damages;

C.    Directing the Individual Defendants to disseminate a Solicitation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.    Declaring that defendants violated Sections 14(e) and/or 20(d) of the 1934 Act, as well as Rule 14d-9 promulgated thereunder;

E.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

-SIGNATURE BLOCK ON NEXT PAGE-

Dated: May 22, 2020

                                      **MOORE KUEHN, PLLC**

                                      */s/Justin Kuehn*
                                      Justin A. Kuehn
                                      Fletcher W. Moore
                                      30 Wall Street, 8th floor
                                      New York, New York 10005
                                      Tel: (212) 709-8245
                                      jkuehn@moorekuehn.com
                                      fmoore@moorekuehn.com

                                      *Attorneys for Plaintiff*